STATE of Utah, Plaintiff and Respondent,

v.

Charles WEBB and John E. Humphrey, Defendants and Appellants.

No. 890256–CA.

Court of Appeals of Utah.

March 26, 1990.

---

Samuel Alba (argued), Sally B. McMinimee, Prince, Yeates & Geldzahler, Salt Lake City, for defendants and appellants.

R. Paul Van Dam, Atty. Gen., Dan Larsen (argued), Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

Before BENCH, JACKSON and BULLOCK [1], JJ.

## OPINION

JACKSON, Judge:

Defendant Charles Webb challenges his jury conviction of aggravated robbery, a first degree felony in violation of Utah Code Ann. § 76–6–302 (1978). He raises the following substantial issues: denial of effective assistance of counsel; illegal search of his apartment and of his mate's purse; and insufficiency of the evidence. He also challenges the sentence imposed. We affirm the conviction, but remand the case with instructions to correct the sentence.

## FACTS

In January 1987, Britt Martindale met defendant Webb and his girlfriend, Carolyn Gregersen, while in the hospital. Through them, Britt met John Humphrey, who stayed at her home for several days in mid-October 1987. At that time, Britt lived several blocks away from the apartment shared by Webb, Gregersen, her ten-year old son, and their infant son.

At approximately 3:30 p.m. on October 21, 1987, a bearded man held the owner of a Salt Lake City jewelry store and a security guard at gunpoint while he robbed the store of cash, jewelry, and diamonds worth approximately $40,000. The man had pulled a sawed-off shotgun from a cloth bag and directed the owner to put the contents of his safe and his display cases into the bag. Before leaving, the robber advised the two men not to try to follow him because he had "another guy" with a gun waiting outside. At trial, the store owner and the security guard identified Webb's codefendant, John Humphrey, as the robber.

According to the testimony of Britt Martindale, Webb drove up to her Midvale, Utah, home in a Cadillac at approximately 4:00 p.m. on October 21, 1987, with Gregersen in the passenger seat. Webb backed the car into Martindale's driveway, came into her home, and spoke to her briefly. He took the blanket off her bed and directed her to follow him outside to the car, where he handed her one side of the blanket and instructed her to hold it up. Webb told Gregersen to push the trunk release button inside the car. The trunk lid opened and inside Martindale saw Humphrey, whom she had seen many times, including a day or two before October 21, 1987. Everyone went inside her apartment, where Humphrey went into the bathroom and immediately began shaving off his beard. Webb went back outside and returned shortly with a canvas bag and a sawed-off shotgun with black tape around the handle, which he handed to Britt. She put the shotgun, which she later identified as the shotgun seized from Webb's bedroom and put into evidence, on a shelf in

**1.** J. Robert Bullock, Senior District Judge, sitting by special appointment pursuant to Utah Code Ann. § 78–3–24(10) (Supp.1989).

her pantry, while Webb and Gregersen sat at her kitchen table and went through money, rings, and other jewelry, including loose diamonds, an opal, and a diamond watch, that they removed from the canvas bag. Webb asked Humphrey's permission to give the diamond watch to Gregersen, and then did so. Britt later identified the diamond watch taken from Gregersen's purse as the watch she saw Webb take from the canvas bag and give to Gregersen. Meanwhile, Humphrey walked back and forth between the bathroom and the kitchen while shaving, explaining how "he put the shotgun in some guy's face" and handcuffed a guard who had walked in on them. Webb said everything "went great" and that it was a "little while before the cops showed up." He placed the jewels in a paper bag and put the canvas bag in a kitchen cupboard, telling Britt not to "mess with it" until he came back for it.

After approximately forty-five minutes, Britt's husband, Russell Martindale, arrived. Ten minutes later, Webb, Humphrey, and Gregersen left the Martindale apartment with the paper bag. In a phone conversation with Britt shortly thereafter, Webb asked if she had seen "it" on the news. Webb returned to the Martindale home a few hours later and left again with the canvas bag, saying he was going to put it in the river. Webb and Humphrey returned again at approximately 11:30 p.m. After Britt gave Webb the shotgun, Webb and Humphrey left for Las Vegas along with Russell Martindale.

On November 2, 1987, the police learned that Britt might know something about the robbery. The police interviewed her on November 3. Based on the information she provided, the police obtained an arrest warrant for Webb, Gregersen, and Humphrey, who was staying at the Webb/Gregersen home that night. The warrant was executed by ten officers on the morning of November 4, 1987, at the apartment of Webb and Gregersen. Gregersen was arrested and handcuffed in the living room of the apartment. Her purse was searched for weapons incident to that arrest, and the diamond watch ultimately introduced by the State at trial was observed; however, it

was not seized until later at police headquarters. While Gregersen's arrest was going on in the living room area, Webb and Humphrey were arrested in separate bedrooms and then brought to the living room area. The police seized a shotgun from the bedroom in which Webb had been found. A short time later, Gregersen signed a consent-to-search form. During the ensuing search of the apartment, conducted after the trio had been taken away, the police seized miscellaneous paperwork, some clothing, and jewelry, including a ring from Gregersen's jewelry box. The diamond watch and the ring were both identified by the store owner as items stolen from him on October 21, 1987.

At their preliminary hearings in late November 1987, Webb and Humphrey were represented by two attorneys from the Salt Lake Legal Defenders Association. Webb's appointed counsel withdrew from representing Webb two weeks later at his arraignment and Webb privately retained attorney Ray Stoddard to represent him and Gregersen. Humphrey continued to be represented by appointed counsel from the Legal Defender Association, Lisa Remal. In early January 1988, Remal filed a motion to sever Humphrey's trial from Gregersen's, a motion in which Stoddard joined on behalf of Webb. Also in January 1988, on behalf of Webb and Gregersen, Stoddard filed a motion to suppress the use of the shotgun, ring, and diamond watch as evidence. After an evidentiary hearing, the motion to sever Gregersen's trial from that of Webb and Humphrey was granted, and the suppression motion was denied.

In early March 1988, Stoddard filed a motion to withdraw as Webb's counsel, partly based on unspecified "differences" between Webb and Stoddard about how Webb's defense should be conducted. A few days later, Stoddard filed a motion to sever Webb's trial from Humphrey's on the ground that substantially more evidence would be adduced against Humphrey and defendant Webb would be prejudiced by the jury's inclination to find him guilty by association. The motion to withdraw as Webb's counsel was subsequently granted,

and another attorney at the Salt Lake Legal Defenders Association, Brooke Wells, was appointed to represent Webb, while Stoddard continued to represent Gregersen. Webb's severance motion was not pursued by his new counsel. After Webb's supplemental motion to suppress evidence seized from the apartment was denied and discovery was conducted, the codefendants proceeded to a joint trial in early June 1988.

At trial, Britt testified to the events at her house on October 21, 1987, recited above. Russell Martindale admitted he had stolen a car at Webb's request that was used in the jewelry store robbery. He had turned this car over to Webb in Salt Lake City on October 20, 1987. He stated that Webb had promised to pay his rent in exchange for the stolen car, and he denied knowing what was to be done with it. A coat and hat found in that car matched the eyewitnesses' description of the clothing worn by the robber. Russell also testified that, the night of October 21, Webb told him he knew someone in Las Vegas who could get rid of the stuff Webb and Humphrey had stolen. Russell was granted immunity from prosecution for car theft in exchange for trial testimony concerning the robbery.

Webb and Humphrey both testified and presented a united defense, claiming that they had been set up by the Martindales. Webb stated that he had purchased the ring and watch from Britt on November 2, 1987, and had then given the ring to Gregersen for her birthday. He claimed to have been in Ely, Nevada, pursuing his occupation as a seller of gold, silver, and

diamonds when the robbery occurred, and he introduced a gas station receipt from there dated October 21, 1987, the day of the robbery. He admitted that he had pawned some diamonds in Las Vegas on October 22, 1987. Humphrey testified that he was staying at the Martindale apartment on October 21 and that Britt and Russell left the apartment about 3:00 p.m. that day and returned at 4:00 p.m. with a bearded man known to him only as Frank. Frank carried a large bundle wrapped in a quilt into the back bedroom. Humphrey said he never saw any weapon or jewelry. After "cleaning up" by shaving his own beard off, Humphrey left with Frank and Russell about 5:00 p.m. to go to Las Vegas, where they met up with Webb, and Frank left them. Humphrey stated he had seen Webb buy the diamond watch and a ring from Britt at her home on November 2.

After the jury found Webb and Humphrey guilty of aggravated robbery, Webb filed a motion for new trial claiming that his trial attorney, Wells, had inadequately represented him because of a conflict of interest created by her desire to not make her colleague at the Salt Lake Legal Defenders Association, Humphrey's counsel, "look bad." The trial court denied this motion, and Webb's appeal was pursued by newly-appointed private counsel.

## ASSISTANCE OF COUNSEL

Webb first claims he was denied the effective assistance of counsel guaranteed by the sixth amendment because his trial attorney jointly represented his and Humphrey's conflicting interests.[2] This

**2.** On appeal, Webb contends for the first time that the right to counsel guaranteed in Article I, section 12 of the Utah Constitution should be interpreted more expansively than the federal provision, with the result that the state constitution would impose an affirmative duty on state trial judges to inquire into potential conflicts of interest any time codefendants are represented by members of the same law firm or public defender office. As explained at greater length in the portion of this opinion dealing with the fourth amendment claims, in the absence of exceptional circumstances or plain error, an appellate court normally will not consider issues, even constitutional ones, that have not been presented first to the trial court for its

consideration and resolution. *See State v. Anderson,* 129 Utah Adv.Rep. 15, 16 (1990); *State v. Johnson,* 771 P.2d 326, 327–28 (Utah Ct.App.1989). Even if that principle of appellate review were not a bar, we would still not resolve the state constitutional claim raised here. Webb's appellate counsel simply asserts that a different result should flow from the Utah constitutional guarantee without adequately briefing or arguing for different analyses under the state and federal constitutions. We need not address the important question of the parameters of the Utah constitutional guarantee under such circumstances. *E.g., State v. Wareham,* 772 P.2d 960, 966 (Utah 1989) (refusing to ad-

claim is based on the multiple representation of the two codefendants at their joint trial by two attorneys from the Salt Lake Legal Defenders Association.[3]

The sixth amendment right to effective assistance of counsel includes the right to counsel free from conflicts of interest. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Ordinarily, a claim of ineffective assistance of counsel must be analyzed under the two-pronged test set forth in *Strickland.* Under that standard, a criminal defendant must show both that his counsel's performance was deficient and that it prejudiced his defense. *Id.* at 687, 104 S.Ct. at 2064; *State v. Carter,* 776 P.2d 886, 893 (Utah 1989); *State v. Grueber,* 776 P.2d 70, 76 (Utah Ct.App.), *cert. denied,* 783 P.2d 53 (Utah 1989). However, a sixth amendment claim grounded on conflict of interest is a special subtype of ineffectiveness claim, which must be examined under a somewhat different standard that was first enunciated in pre-*Strickland* cases.

In *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), one attorney was appointed to represent three codefendants. Before trial, the attorney objected to his continued representation of all three and requested the appointment of separate counsel because of the possibility for conflict arising from his receipt of confidential information from the codefendants. The pretrial motion for separate counsel was denied before trial and a renewed motion was again denied just before the jury was empanelled. *Id.* at 484, 98 S.Ct. at 1179. Because these efforts "brought home to the court" the possibility of inconsistent interests among the codefendants, the United States Supreme Court reversed the conviction because of the trial court's failure to appoint separate counsel or take adequate steps to ascertain whether the risk of conflict was too remote to warrant separate counsel. *Id.* The trial court's failure to investigate a potential conflict of interest based on multiple representation brought to its attention in a timely manner was presumed to be prejudicial, requiring reversal because it unconstitutionally endangered the right to counsel. *Id.* at 483–87, 98 S.Ct. at 1178–80.

The United States Supreme Court subsequently clarified that, although *Holloway* required trial judges to investigate any timely objections to multiple representation, the sixth amendment does not require state court judges to initiate sua sponte inquiries into the propriety of an attorney's representation of codefendants in every case:

Defense counsel have an ethical obligation to avoid conflicting representation and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. Indeed, as the Court noted in *Holloway, supra,* at 485–486, 98 S.Ct. at 1179, trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. "An 'attorney representing two defendants in a criminal matter is in the

---

dress appellant's claim of unconstitutionality in the absence of legal analysis and supporting authority); *State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988) (appellate court will not engage in constructing arguments "out of whole cloth" on behalf of defendants).

**3.** In *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), the United States Supreme Court considered a defendant's claim that the joint representation of himself and a coindictee at separate murder trials by two law partners denied him effective assistance of counsel because they had represented actually conflicting interests to his detriment. Although the Court noted that there was "much sub-

stance" to the argument that such an arrangement creates a possible conflict of interest, *id.,* 107 S.Ct. at 3120, it specifically assumed, without deciding, that two law partners are considered one attorney for purposes of sixth amendment analysis. *Id.* In his appeal and before the trial court, Webb has assumed that two attorneys from the same defender office constitute a single attorney for purposes of sixth amendment analysis, and the State has not contested the matter. We, therefore, proceed with our analysis of the ineffectiveness claim on the same basis, without considering or deciding this threshold question.

best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of trial.'" 435 U.S. at 485, 98 S.Ct. at 1179, quoting *State v. Davis*, 110 Ariz. 29, 31, 514 P.2d 1025, 1027 (1973). Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.

*Cuyler v. Sullivan*, 446 U.S. 335, 346–47, 100 S.Ct. 1708, 1717–18, 64 L.Ed.2d 333 (1980) (footnotes omitted); *accord United States v. Burney*, 756 F.2d 787, 790–93 (10th Cir.1985) (sixth amendment does not require trial judge to initiate inquiry into potential conflict of interest when no party either objects to multiple representation or raises a conflict issue).

■■■■ Noting that a possible conflict of interest inheres in almost every instance of multiple representation, the *Cuyler* court explained that the *Holloway* presumption of prejudice from a possible conflict of interest is only appropriate in cases where the trial court did not provide an objecting defendant with an "opportunity to show that potential conflicts impermissibly imperil his right to a fair trial." *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718. The Court reaffirmed that multiple representation does not violate the sixth amendment unless it gives rise to a conflict of interest, holding that the *possibility* that multiple representation involved a conflict of interests is insufficient to impugn a criminal conviction. *Id.* at 350, 100 S.Ct. at 1719; *see also Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987) (permitting joint representation of codefendants is not per se violation of sixth amendment guarantee of effective assistance of counsel); *Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir.), *cert. denied*, 484 U.S. 870, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987). Therefore, a defendant who raises no objection at trial to multiple representation must show that an actual conflict of interest existed which adversely affected his lawyer's performance. *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718; *Thomas*, 818 F.2d at 480; *Fitzpatrick v. McCormack*, 869 F.2d 1247 (9th Cir.1989). A defendant who

makes such a showing need not demonstrate prejudice to establish an ineffectiveness of counsel claim. *Cuyler*, 446 U.S. at 349–50, 100 S.Ct. at 1718–19; *see Thomas*, 818 F.2d at 480 n. 3.

The reasons for presuming prejudice in conflict of interest cases meeting this standard, which is less rigorous than the *Strickland* test generally applicable to ineffective counsel claims, was explained in *Strickland* itself:

> In *Cuyler* ... [we] held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make an early inquiry in certain situations likely to give rise to conflicts ... it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above [i.e., actual or constructive denial of the assistance of counsel altogether]. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."

*Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067 (quoting *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719); *accord Burger*, 107 S.Ct. at 3120.

In this case, although no specific objection to joint representation of Webb and Humphrey by two public defenders was ever raised until after his conviction, Webb contends that the trial court knew or should have known about the possibility that the defenders were representing conflicting interests and that the trial court's failure, on its own motion, to either appoint Webb counsel who was not a public defender or inquire further into the issue before

or during trial violated his sixth amendment right to effective assistance of counsel. *See Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719; *United States v. Akinseye*, 802 F.2d 740, 744–46 (4th Cir.1986) (absent a specific conflict objection, trial court may assume that joint representation does not involve any conflict unless court knows or has reason to know that particular conflict exists), *cert. denied sub nom. Ayodeji v. United States*, 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987). Reversal and remand for a new trial are required as in *Holloway*, Webb argues, because he has demonstrated a potential conflict of interest, from which prejudice must be presumed.

In support of his argument that the trial judge violated a sixth amendment duty to investigate further the potential conflict of interest, Webb contends that the following were sufficient to bring to the trial court's attention the potential for conflict arising from joint representation of him and Humphrey by two attorneys from the Salt Lake Legal Defenders Association (SLLDA): (1) his March 1988 motion to sever his trial from that of Humphrey; (2) the trial court's appointment of the two SLLDA attorneys to represent two codefendants; and (3) his post-conviction motion for new trial.

▇ In *Cuyler*, as noted above, the United States Supreme Court rejected the proposition that the representation of codefendants by a single attorney was, in and of itself, a "special circumstance" from which a trial judge "knows or reasonably should know that a particular conflict" of interest exists, thereby creating a duty on the court to inquire further into the conflict. In this case, therefore, the fact of representation of Webb and Humphrey by two SLLDA attorneys is alone insufficient to impose such a duty on the trial judge. *See State v. Bell*, 90 N.J. 163, 447 A.2d 525 (1982) (no presumption of prejudice arising solely from multiple representation of codefendants by attorneys from same public defender office).

▇ We reach the same conclusion regarding the duty of the trial judge in this case even when the codefendants' joint representation at trial by SLLDA lawyers is viewed in light of the fact that the case file contained Webb's pretrial motion to sever his trial from Humphrey's. At the time the motion was filed, the codefendants were not represented by the two defenders. Webb was still represented by a private retained attorney and Humphrey was represented by a public defender. After Wells was appointed to replace Stoddard as Webb's counsel nearly three months before trial, the codefendants did nothing to alert the trial judge to a potential or actual conflict between them.[4] There is nothing in this record to suggest that the trial judge actually knew of the vague, general assertions in the earlier severance motion about the difference in the quantum of evidence that would allegedly be presented at trial against the codefendants. No hearing on the severance motion was requested or held; likewise, no ruling on the motion was requested or obtained. In the absence of other facts or circumstances that should reasonably bring a conflict of interests between codefendants to the trial court's attention, we decline to hold that, for purposes of invoking the rule set forth in *Holloway* and *Cuyler*, a trial judge "knows or reasonably should know" before or at trial of a conflict suggested in an abandoned pretrial severance motion. By the time of trial, the trial judge in this case

---

**4.** In his reply brief, Webb also alludes to Humphrey's April and May 1988 handwritten pro se motions, both captioned "Motions for Conflict of Interest," as providing sufficient notice to the trial court of a potential conflict arising from representation of the codefendants by the two public defenders. In his motion, Humphrey asserted that Webb would be deprived of a fair trial if the robbery victims were allowed to identify Humphrey as the robber at trial since, Humphrey claimed, their pretrial identification of him was unconstitutional. The "conflict of interest" referred to by the caption on Humphrey's motions appears to be Humphrey's disagreement with counsel over the handling of this pretrial identification issue, which had already been argued to, but rejected by, the trial court. In light of the court's resolution of Humphrey's claims, these motions were insufficient to alert the trial court to any potential conflict of interests.

could reasonably assume that, in the face of the State's evidence linking Webb and Humphrey and in spite of the victims' identification of Humphrey, Webb's trial counsel had made a tactical decision not to pursue a defense based on disassociating Webb from Humphrey but to press a united defense—i.e., that both codefendants were framed by the Martindales and that the identification of Humphrey by the robbery victims was erroneous—at one trial. There was nothing at the trial itself suggesting to the trial judge that Webb's legal representation was in any way compromised by the other public defender's representation of Humphrey. On the contrary, the judge could see at trial that Webb was actively participating in the joint defense, an affirmative indication that Webb considered the codefendants' interests as being in harmony, not in conflict.

■ Finally, we reject out-of-hand Webb's absurd contention that his post-conviction motion for new trial was the timely "objection at trial" contemplated by Holloway, a proposition for which he cites no supporting authority. There is no question that Webb knew of the alleged conflict of which he now complains no later than at trial. Although his motion for new trial could be regarded as sufficient to preserve for consideration in this direct appeal his ineffectiveness of counsel claim arising from counsel's representation of purportedly conflicting interests, see People v. Precup, 73 Ill.2d 7, 21 Ill.Dec. 863, 382 N.E.2d 227 (1978); but see Armstrong v. People, 701 P.2d 17, 21 (Colo.1985) (issue can be considered on direct appeal even if not raised in new trial motion), it was untimely for purposes of invoking the Holloway automatic reversal rule, which is based on a trial judge's failure to act once on notice that there was a possible conflict of interests between jointly represented codefendants.

Unlike the pretrial and trial objections of the defendant in Holloway, 435 U.S. at 484, 98 S.Ct. at 1178, described by the Court as "focused explicitly on the probable risk of a conflict of interests" between defendants represented by a single defense attorney, the record in this case discloses an insufficient basis on which to hold that the trial court reasonably should have known before or at trial that the two SLLDA attorneys were representing codefendants with conflicting interests. We therefore conclude that the sixth amendment imposed no affirmative duty on the trial judge to act sua sponte and appoint Webb a non-SLLDA attorney or inquire into the propriety of the representation of the codefendants by two public defenders from the same office.

■ Because the alleged conflict in this case was not adequately raised in the trial court until after his conviction, Webb can succeed on his sixth amendment ineffectiveness of counsel claim only if he demonstrates both that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance. See Strickland, 466 U.S. at 692, 104 S.Ct. at 2067; United States v. Dressel, 742 F.2d 1256, 1259–60 (10th Cir.1984). We conclude that Webb has failed to sustain his burden on both points.

■ In order to show an actual conflict of interest existed, a defendant must point to specific instances in the record to suggest an actual conflict or impairment of his or her interests. Thomas, 818 F.2d at 481; Burney, 756 F.2d at 792. There is no violation where the conflict is irrelevant or merely hypothetical; there must be an actual, significant conflict. Thomas, 818 F.2d at 481.

> Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney "made a choice between possible alternative courses of action.... If he did not make such a choice, the conflict remained hypothetical." .... An actual conflict of interest exists when the respective defenses of multiple defendants are inconsistent, i.e., if "introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing."

United States v. Mers, 701 F.2d 1321, 1328 (11th Cir.) (citations omitted), cert. denied,

464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983). Until a defendant shows an actual conflict, "he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719.

Webb asserts that an actual conflict was demonstrated by his trial attorney's pursuit of a united defense with Humphrey at a joint trial "in spite of the evidence and Webb's desire to impeach the testimony of his codefendant." We disagree. This is not a case in which the evidence produced against Webb was wholly circumstantial, while that against his codefendant was direct. Nor is this a case in which the codefendants' interests actually conflicted because of a substantial disparity of evidence incriminating each defendant, as in *Armstrong,* 701 P.2d at 22. Although there was eyewitness victim testimony identifying Humphrey, not Webb, as the robber in the store, the Martindales testified to Webb's direct involvement before and immediately after the crime. The two codefendants took the stand and gave entirely consistent, corroborative testimony to support their claim that the Martindales were the real culprits while they were only patsies. Webb's counsel aggressively challenged the reliability of the robbery victims' identification of Humphrey as the robber.

Under these circumstances, we are convinced that counsel's loyalty was not divided between Webb and a codefendant with actual conflicting interests. *See United States v. Cantu,* 786 F.2d 712 (5th Cir.) (per curiam) (no conflict where jointly represented codefendants charged with conspiracy to file false tax returns pursued joint defense claiming that neither party filed fraudulent returns), *cert. denied,* 479 U.S. 847, 107 S.Ct. 169, 93 L.Ed.2d 106 (1986); *Mers,* 701 F.2d at 1329 (no conflict where codefendants pressed same defense and corroborated each other); *Government of Canal Zone v. Hodges,* 589 F.2d 207 (5th Cir.) (joint alibi defense), *cert. denied,* 441 U.S. 948, 99 S.Ct. 2173, 60 L.Ed.2d 1052 (1979); *Wright v. State,* 442 So.2d 301 (Fla. Dist.Ct.App.1983) (no conflict of interest where jointly tried codefendants in rape trial both used consent defense).

Furthermore, even if we were to conclude that the difference in the nature of the evidence adduced at trial demonstrated an actual conflict of interest, Webb has failed to demonstrate that it resulted in any adverse effect on his counsel's performance. He merely asserts that the conflict caused his attorney not to pursue a nonunited defense at a separate trial and assumes that this is sufficient to demonstrate an adverse effect. Faced with such a claim of omission, however, a reviewing court must determine from the record (1) whether the arguments or actions allegedly omitted would likely have been made by other counsel, and (2) whether there was a tactical reason (other than the asserted conflict) for the omission. *People v. Easley,* 46 Cal.3d 712, 759 P.2d 490, 498–99, 250 Cal.Rptr. 855 (1988).

There is absolutely nothing in the record to suggest that counsel's choice of the united defense strategy, which Webb apparently supported enthusiastically until it produced an unfavorable verdict, was in any way prompted by a desire or effort to bolster Humphrey's defense at Webb's expense. Any reasonably competent counsel representing Webb but not Humphrey would not have chosen any different defense strategy. Webb would likely have gained nothing by abandoning the common defense and challenging Humphrey's credibility at a separate trial. On the record before us, counsel simply had no other defense options to pursue, and Webb has suggested none. The frame-up defense, coupled with an attack on the robbery victims' ability to make a reliable identification of Humphrey, was the only viable defense tactic available to Webb in light of the State's evidence, including Britt Martindale's testimony placing Humphrey and Webb together at her home with the jewelry and shotgun shortly after the robbery. Therefore, there was a tactical reason, other than multiple representation of Webb and Humphrey, underlying the decision to pursue the united defense strategy at a joint trial.

As the United States Supreme Court pointed out in rejecting any per se rule that would prohibit a single attorney from ever representing codefendants, "in some cases, certain advantages might accrue from joint representation. In Mr. Justice Frankfurter's view: 'Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack.'" *Holloway*, 435 U.S. at 482–83, 98 S.Ct. at 1177–78 (quoting *Glasser v. United States*, 315 U.S. 60, 92, 62 S.Ct. 457, 475, 86 L.Ed. 680 (1942) (Frankfurter, J., dissenting)).

Because Webb has failed to demonstrate an actual conflict of interest which adversely affected his attorney's performance, we reject his claim of ineffective counsel and conclude that the trial court properly denied Webb's motion for a new trial.

## MOTION TO SUPPRESS

### A. Execution of Arrest Warrants

■ We next consider Webb's attacks on the trial court's denial of his motion to suppress the shotgun, the ring, and the diamond watch. He first contends that the seizure of these items violated his fourth amendment rights because the arrest warrants for him, Humphrey, and Gregersen, which form the basis for the lawful presence of the police officers in the apartment, were not executed in the manner prescribed by the prior demand requirements in Utah Code Ann. §§ 77-7-6, -8 (1982).[5] In essence, Webb argues that any search of the apartment following an arrest in which the arrest warrants were executed in a manner violating these statutes is per se unreasonable under the fourth amendment,

requiring application of the exclusionary rule.

However, this statutory noncompliance issue was not raised or argued to the trial court as one of the grounds in support of defendant's motion to suppress, either before or at trial. As a result, the trial court made no ruling on whether sections 77-7-6 and -8 were violated and it made no findings to resolve discrepancies in the testimony at the suppression hearing on factual questions critical to the statutory noncompliance issue, such as whether demand and explanation were actually given, whether there was a "breaking" of the apartment door, and whether there were facts constituting an exception to the demand requirements.

As the Utah appellate courts have reiterated many times, we generally will not consider an issue, even a constitutional one, which the appellant raises on appeal for the first time. *E.g., State v. Anderson*, 129 Utah Adv.Rep. 15, 16 (1990); *Jolivet v. Cook*, 115 Utah Adv.Rep. 17, 19 (1989) (cruel and unusual punishment claim); *State v. Chancellor*, 704 P.2d 579, 580 (Utah 1985) (per curiam) (probable cause to stop vehicle); *State v. Sparks*, 672 P.2d 92, 94 (Utah 1983) (speedy trial right); *State ex. rel. M.S.*, 781 P.2d 1289 (Utah Ct.App.1989) (constitutionality of statute). This principle of appellate review has been applied to fourth amendment challenges to the admission of evidence: "[W]here a defendant fails to assert a particular ground for suppressing unlawfully obtained evidence in the trial court, an appellate court will not consider that ground on appeal." *State v. Carter*, 707 P.2d 656, 660 (Utah 1985); *accord State v. Constantino*, 732 P.2d 125,

---

**5.** Section 77-7-8 provides:

To make an arrest, a private person, if the offense is a felony, and in all cases, a peace officer, may break the door or window of the building in which the person to be arrested is, or in which there are reasonable grounds for believing him to be. Before making the break, the person shall demand admission and explain the purpose for which admission is desired. Demand and explanation need not be given before breaking under the exceptions in section 77-7-6 or where there is reason to believe evidence will be secreted or destroyed.

Insofar as it is relevant to the situation presented in this case, section 77-7-6 does away with the prior demand and explanation requirement when

(1) There is reason to believe the notice will endanger the life or safety of the officer or another person or will likely enable the party being arrested to escape[.]

A similar argument involving police compliance with the knock-and-announce statute applicable to executions of search warrants, Utah Code Ann. § 77-23-10(2) (1982), was considered by the Utah Supreme Court in *State v. Buck*, 756 P.2d 700 (Utah 1988).

126 (Utah 1987) (per curiam); *State v. Johnson*, 771 P.2d 326, 328 (Utah Ct.App. 1989). The *Carter* court relied on *State v. Lee*, 633 P.2d 48 (Utah), *cert. denied*, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981), in which it pointed out that suppression motions should be supported by precise averments, not conclusory generalizations, and held that, in the absence of special circumstances, the appellate court will not rule on available grounds not addressed in the trial court. *Lee*, 633 P.2d at 53; *see* Utah R.Crim.P. 12(a) (grounds for a motion must be stated "with particularity"). "[T]o entertain the point now would be to sanction the practice of withholding positions that should properly be presented to the trial court but which may be withheld for purposes of seeking a reversal on appeal and a new trial or dismissal." *Carter*, 707 P.2d at 661 (quoting *Lee*, 633 P.2d at 53).

Exceptions to this general rule consist of those cases in which there are "exceptional circumstances" for the failure to raise the issue below, *Jolivet*, 115 Utah Adv.Rep. at 19, or cases where the plain error rule is applicable, *Anderson*, 129 Utah Adv.Rep. at 16; *State v. Gibbons*, 740 P.2d 1309, 1311 (Utah 1987); *cf. State v. Breckenridge*, 688 P.2d 440, 443 (Utah 1983) (stating that the exception applies where a "liberty interest" is at stake). In this case, there is nothing in the record to suggest that the statutory noncompliance ground now asserted by Webb was unknown or unavailable to him before or at trial. He has not contended that the plain error exception should apply or that any special circumstances justify his failure to present this particular ground for the motion to suppress to the trial court, nor do we perceive any in the record. We, therefore, will not consider the statutory noncompliance challenge to the validity of the seizure of the evidence, which he raises here for the first time. *See Carter*, 707 P.2d at 661.

### B. Shotgun

Webb contends that, even if the officers were lawfully present in his apartment for purposes of making the arrests, the warrantless search of the bedroom in which he was arrested, which led to the seizure of the shotgun, was unlawful because it was not incident to his arrest. The factual premise for this argument is that the gun was not observed and seized until the officers re-entered that bedroom after Webb had been arrested and taken from the room. Once he was taken from the bedroom in handcuffs, Webb argues, the bedroom was not "an area within his immediate control," *State v. Harris*, 671 P.2d 175, 180 (Utah 1983), that could be re-entered and searched for weapons. The State accepts this factual premise and contends that the shotgun was seized in plain view [6] when the police officers, after arresting Webb pursuant to an arrest warrant, re-entered the bedroom as part of a "protective sweep" to search for other dangerous persons on the premises, *see Maryland v. Buie*, —— U.S. ——, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), prior to conducting their intensive search of the apartment pursuant to Gregersen's consent.

We, however, have carefully reviewed the record of the suppression hearings and find insufficient support in the evidence for Webb's version of the events leading to the seizure of the shotgun. Detective Dalling, who was one of the officers who arrested Webb and then was involved in securing the written consent from Gregersen, made clear that the shotgun had already been located prior to her consent to search the entire premises, although he was not the officer who located the shotgun. In response to questioning from attorney Stoddard—who appeared confused about whether Webb and Humphrey had been found in the same bedroom, but in a different bedroom from the one in which the

---

**6.** A warrantless seizure justified on the basis of the "plain view" exception requires: (1) the lawful presence of the officer; (2) evidence in plain view; and (3) evidence which is clearly incriminating. *State v. Kelly,* 718 P.2d 385, 389 (Utah 1986); *State v. Holmes,* 774 P.2d 506, 510 (Utah Ct.App.1989). Webb does not dispute the presence of the last two elements of the plain view doctrine. Instead, he asserts only that the re-entry of the police into his bedroom once he had been removed from it was unlawful.

shotgun was found—Detective Dalling also indicated that he had located Webb prior to the shotgun being found. Counsel asked no further questions on this point to clarify which of several officers present in Webb's bedroom to arrest him had located the shotgun and whether it had been located during the time the officers were lawfully present to effectuate the arrest, even if it was not physically seized until Webb was secured and removed to another room. There is simply no evidence that, with Webb in handcuffs, all the arresting officers left the room totally unaware of the shotgun and then returned to that room later and discovered the shotgun in plain view for the first time. From the testimony presented, it appears that the shotgun was located while the officers were lawfully present in the room to arrest Webb. We therefore reject Webb's contentions and conclude that, on the evidence before it, the trial court did not err in admitting the shotgun into evidence.

### C. Jewelry

Webb next challenges the admission into evidence of the diamond watch and the ring. He disputes the legality of the warrantless search of Gregersen's purse, which ultimately resulted in the seizure of the diamond watch, by asserting that it was not incident to her lawful arrest since she was already handcuffed when the purse was searched. He also contends that the subsequent warrantless search of the apartment, during which the ring was found in a jewelry box on the dresser in the master bedroom, was illegal because Gregersen did not voluntarily consent to it.[7]

The State responds that Webb failed to establish his standing to raise either of these two distinct fourth amendment claims and that, even if we conclude Webb has standing to challenge the admissibility of the ring, he loses on the merits because Gregersen voluntarily consented to the search of the apartment.

At the first suppression hearing, Webb's counsel contended that the search of Gregersen's purse was not incident to her lawful arrest and that Gregersen's written consent to search the premises was involuntary because she was coerced and under duress, mostly out of fear for her children's safety. The State then went forward with testimony from the arresting officers concerning the facts surrounding the arrests, the search of Gregersen's purse in conjunction with her arrest, and the subsequent obtaining of Gregersen's written consent to search the entire premises.

According to the officers' testimony, they encountered Gregersen immediately upon entering the apartment. She was placed under arrest, handcuffed, and required to kneel on the living room floor. Her purse, apparently lying nearby, was searched for weapons by one of the arresting officers. Her infant son was placed in a small crib on the floor next to her. She remained in the living room, agitated and crying, for six or seven minutes while the officers arrested the other two suspects. Gregersen was then allowed to stand up and move to a chair at the kitchen table. Her older son called her sister to come and take custody of the children. The officers then began asking her questions. After determining that she paid rent on the apartment, they requested her consent to search the apartment, explaining that they were looking for weapons and for jewelry taken in the robbery and that she did not need to sign the consent form. She was also permitted to smoke, drink coffee, and use the bathroom. When Gregersen took the stand, she stated that her jewelry was kept in her jewelry box on her dresser in the master bedroom, but she did not dispute the arresting officer's testimony concerning the search of her purse. She also claimed that she was upset by the police's armed entry, that the police would not let her hold her crying infant son, and that she did not remember signing any consent form or talking to the officers about a search of the premises.

---

**7.** Webb does not contend that Gregersen lacked the power to consent to the search of the apart-

ment or the master bedroom in which the jewelry box was located.

In his supplemental motion to suppress, Webb renewed his challenge to the legality of the search of the premises that led to the discovery of the ring. This time, his motion was grounded on Gregersen's claim that the signature on the consent form was not, in fact, her signature. At the start of the evidentiary hearing, Webb himself took the stand as the moving party for the limited purpose, according to his counsel, of "establishing his residence and standing to bring [the] motion." In testimony that the State did not controvert, Webb stated that he resided at the apartment he shared with Gregersen, along with their infant child; he was actually living there on the date the arrest warrants were executed and the premises searched; and he monetarily contributed to the support of their household by paying half the utility bills and over half the rent. He did not testify to any interest in the purse searched or in the diamond watch seized from that purse.

 Because fourth amendment rights are personal rights which may not be vicariously asserted, *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969), the proponent of a motion to suppress has the burden of establishing that his own fourth amendment rights were violated by the challenged search or seizure. *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978). A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his fourth amendment rights infringed. *Id.* at 134, 99 S.Ct. at 425. "And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." *Id.* Therefore, the central inquiry in any suppression hearing grounded on a purportedly illegal search is whether the defendant challenging the admission of evidence has shown a "legitimate expectation of privacy in the invaded place." *United States v. Salvucci,* 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2552–53, 65

L.Ed.2d 619 (1980) (quoting *Rakas,* 439 U.S. at 140, 99 S.Ct. at 428). The inquiry is the same whether whether the challenged search is of premises, such as the apartment in *Salvucci,* or of a tangible object, such as the glove box in *Rakas* or the purse in *Rawlings v. Kentucky,* 448 U.S. 98 at 105, 100 S.Ct. 2556 at 2561, 65 L.Ed.2d 633 (1980). *See also United States v. Knox,* 839 F.2d 285 (6th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1988) (search of travel bags).

 As this court recently pointed out, there is no bright line test to use in making this fact-sensitive determination. *State v. Grueber,* 776 P.2d 70, 73 (Utah Ct.App.) (quoting *Rakas,* 439 U.S. at 143, 99 S.Ct. at 430), *cert. denied,* 783 P.2d 53 (Utah 1989). A legitimate expectation of privacy incorporates two elements: first, whether the defendant "exhibited an actual (subjective) expectation of privacy," and second, whether that subjective expectation is "one that society is prepared to recognize as reasonable." *Knox,* 839 F.2d at 293 (quoting *United States v. Tolbert,* 692 F.2d 1041, 1044 (6th Cir.1982), *cert. denied,* 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983)); *accord California v. Ciraolo,* 476 U.S. 207, 212, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986). Factors relevant to this inquiry include whether the defendant had any possessory or proprietary interest in the place searched or the item seized in the challenged search; was legitimately on the premises; had the right to exclude others from that place; exhibited a subjective expectation that the place would remain free from governmental invasion; or took normal precautions to maintain his privacy. *United States v. Haydel,* 649 F.2d 1152, 1155 (5th Cir.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982). A defendant's ownership or possession of an item seized in the allegedly unlawful search is not determinative of whether that individual's fourth amendment privacy rights in the place searched have been infringed. *Salvucci,* 448 U.S. at 91, 100 S.Ct. at 2553; *see Rakas,* 439 U.S. at 144 n. 12, 99 S.Ct. at 430 n. 12. On the other hand, a

defendant who establishes a privacy interest in the place searched sufficient to contest the legality of that search, in order to suppress evidence seized as a product of it, is not deprived of fourth amendment standing to assert that claim merely because another person actually owns either the evidentiary items actually seized or the personal effect in which the seized items were found. *See, e.g., Alderman,* 394 U.S. at 176–77, 89 S.Ct. at 968–69; *United States v. Perez,* 700 F.2d 1232 (8th Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 884 (1984); *United States v. Aikens,* 685 F.Supp. 732, 736 (D.Ha.1988); *People v. Koury,* 214 Cal.App.3d 676, 262 Cal.Rptr. 870, 874–75 (1989); *People v. Whisler,* 724 P.2d 648, 650–51 (Colo.1986) (Lohr, J., concurring specially); *see generally* 4 W. LaFave, *Search and Seizure* § 11.3(a) (1987).

In *Perez,* the court concluded that the defendant had a reasonable expectation of privacy in his own house sufficient to allow him to challenge the constitutionality of the search of the house—with the goal of suppressing incriminating items seized during the course of that challenged search—even though the incriminating items were found in a search of handbags and luggage belonging to his houseguests. *Perez,* 700 F.2d at 1236. The United States Supreme Court explained the rationale for such a result in *Alderman,* 394 U.S. at 176–77, 89 S.Ct. at 968–69:

> If the police make an unwarranted search of a house and seize tangible property belonging to third parties ... the homeowner may object to its use against him, not because he had any interest in the seized items as "effects" protected by the Fourth Amendment, but because they were the fruits of an unauthorized search of his house, which is itself expressly protected by the Fourth Amendment.

Webb's fourth amendment claim concerning the ring is similar to that of defendant Perez. *See Perez,* 700 F.2d at 1235–36. Webb contends his personal privacy rights were violated by a warrantless search of his home; consequently, evidence found in that search (i.e., the ring in the jewelry box) should be suppressed. To succeed, he must first show a legitimate expectation of privacy in the "invaded place," i.e., the apartment, as required by *Salvucci.*

His claim concerning the diamond watch, however, is very different. He does *not* contend that the search of Gregersen's purse was the fruit of the purportedly unconstitutional search of his apartment or any part thereof. In this case, such a contention would be untenable since the search of the purse in conjunction with Gregersen's arrest preceded the independently challenged search of the apartment. Instead, Webb seeks to challenge a separate search of a tangible object that took place in the living room of the apartment while the police officers were legally present to execute an unchallenged arrest warrant. Thus, insofar as Webb's motion to suppress the diamond watch is concerned, the "invaded place" in which Webb must preliminarily show a legitimate expectation of privacy is the purse, not the apartment.

■ With this important distinction in mind, we conclude that Webb has standing to contest the legality of the extensive, two-hour search of the apartment. The state did not controvert his testimony that he actually resided there with Gregersen and their child, in a "common law marriage," and that he contributed to household expenses, including rent. From this it can reasonably be inferred that, as a coresident, he had the right to exclude all others except Gregersen from the apartment. He identified the master bedroom, in which the jewelry box containing the ring was located, as "our" bedroom, implying that it was used by him and Gregersen. We conclude that Webb established his legitimate and reasonable expectation of privacy in the apartment as his home, including the master bedroom. Because the challenged governmental search of the master bedroom and the rest of the apartment infringed on Webb's personal fourth amendment rights, he may contest the legality of that search with the goal of preventing the admission of the ring as evidence.

82

On the merits of that issue, however, Webb fails. A warrantless search conducted pursuant to a consent that is voluntary in fact does not violate the fourth amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). It is the State's burden to prove that consent given to a search was voluntary. *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980); *State v. Sierra*, 754 P.2d 972, 981 (Utah Ct.App. 1988). Voluntariness is a question of fact to be determined from the totality of all the circumstances. *Mendenhall*, 446 U.S. at 557, 100 S.Ct. at 1878; *United States v. Carson*, 793 F.2d 1141, 1149 (10th Cir. 1986). We deferentially review a trial court's finding of voluntary consent, like other factual determinations underlying the denial of a motion to suppress, disturbing it only if the appellant demonstrates that there has been clear error. *United States v. Miller*, 589 F.2d 1117, 1130 (1st Cir.1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *State v. Ashe*, 745 P.2d 1255, 1258 (Utah 1987). We do so because of the trial court's more favorable position to assess the credibility of witnesses and resolve conflicting testimony. *Ashe*, 745 P.2d at 1258; *State v. Holmes*, 774 P.2d 506, 509 (Utah Ct.App. 1989). A finding is clearly erroneous if "it is 'against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made.'" *State v. Goodman*, 763 P.2d 786 (Utah 1989) (quoting *State v. Walker*, 743 P.2d 191, 193 (Utah 1987)). However, in evaluating whether a finding of voluntary consent is clearly erroneous, we are not unmindful of the analysis in which a reviewing court must engage to insure that the State has met its burden of proof on this issue:

(1) There must be clear and positive testimony that the consent was "unequivocal and specific" and "freely and intelligently given"; (2) the government must prove consent was given without duress or coercion, express or implied; and (3) the courts indulge every reasonable presumption against the waiver of funda-

mental constitutional rights and there must be convincing evidence that such rights were waived.

*United States v. Abbott*, 546 F.2d 883, 885 (10th Cir.1977) (quoting *Villano v. United States*, 310 F.2d 680, 684 (10th Cir.1962)); *accord Carson*, 793 F.2d at 1150; *United States v. Medlin*, 842 F.2d 1194 (10th Cir. 1988).

When the evidence presented to the trial court is measured against these standards, we are satisfied that the State carried its burden of proof on the voluntariness question, and we conclude that there is no clear error here. The fact that Gregersen was under arrest when her consent was given, although one relevant factor, does not preclude a finding that her consent to search the premises was voluntary. *See United States v. Castillo*, 866 F.2d 1071, 1081–82 (9th Cir.1988). Gregersen was concerned for her children and upset by the officers' armed entry into her home, but there is no evidence that the officers continued to brandish their weapons once the three suspects were arrested. Her infant son was placed near her to alleviate her fears for him. Six or seven minutes after her arrest, she was allowed to get up from the floor and move to the kitchen table, where the police began talking to her. The fact that she was allowed to drink coffee and use the bathroom upon request and that she was not denied any other reasonable request suggests that the atmosphere in the kitchen at that time was not coercive or threatening. An officer told her that they were looking for weapons and for jewelry taken in the robbery and asked for her consent, which he told her she did not have to give. He also explained that, if she did not consent to the warrantless search, it would not be conducted. Gregersen did not testify to any overt or implied threats to her own well-being or that of Webb or her children. There is no evidence that she merely acquiesced to the will of the police because she was already under arrest or because she believed they would do it anyway. She was shown the straightforward consent-to-search form by the officer who testified

that she read it. She asked no questions about it, and indicated no reservations about signing it. The preprinted form she signed contains statements that the police informed her of her constitutional right not to have a warrantless search made of her premises or property; she knew of her lawful right to refuse to consent to such a search; she willingly gave her permission to the officers "to conduct a complete search of the premises and property" located at her address and apartment number; and she did so "without any threats or promises of any kind." Gregersen never claimed that she signed the written consent form only out of fear or coercion or that she misunderstood it; instead, she testified that she did not remember signing the form or discussing the consent with the officers. Under the totality of the circumstances, we cannot say that the finding of voluntary consent to the search of the premises was clearly erroneous. Thus, the trial court properly denied Webb's motion to suppress the ring found in the search of the apartment.

 Returning to the matter of Webb's standing to contest the constitutionality of the prior search of the purse, we conclude that Webb failed to establish that he had a legitimate expectation of privacy in the purse at the time it was searched. There is no evidence, nor even any argument, that Webb owned the purse, that he had ever sought or been given access to Gregersen's purse, or that he had ever put any of his own effects in it. *See Rawlings*, 448 U.S. at 104–06, 100 S.Ct. at 2561–62. At the time of the search, the purse was in proximity to Gregersen in the living room area, while Webb was in another room. Thus, we are left with an object belonging to Webb's mate, in which Webb asserted no interest, which was searched in conjunction with her lawful arrest by police whose presence in the apartment was not the product of an illegal invasion of Webb's privacy rights, leading to the seizure of an

object in which Webb asserted no interest. The only evidence favoring Webb on this standing issue is that the purse belonged to a person with whom he had an intimate relationship and that the purse and its contents were in his home when the challenged search occurred.

Webb is in the same position as the defendant husband in *United States v. Garcia–Rosa*, 876 F.2d 209 (1st Cir.1989), a case relied on by the State and ignored by Webb. In *Garcia–Rosa*, the court noted that the United States Supreme Court has never recognized a standing doctrine that would permit even a spouse to vicariously assert the fourth amendment rights of the other spouse. The court of appeals held that the defendant husband had no standing to challenge the constitutionality of the search of a box belonging to his wife— which was lawfully seized in the couple's home while the police were lawfully present in the couple's master bedroom— because of the husband's failure to establish that he had a reasonable expectation of privacy in the box. *Id.* at 219. On that issue, the court in *Garcia–Rosa* did not consider as determinative the fact that the box was within the four walls of the couple's home when searched. The Colorado Supreme Court likewise concluded that a defendant had failed to establish a legitimate expectation of privacy in his girlfriend's suitcase, even though the suitcase was found in a consent search of the apartment in which they both lived. *Whisler*, 724 P.2d at 650. An expectation of privacy in a room, the Colorado court held, does not extend to another person's locked suitcase within that room. *Id.*

We likewise conclude that the fact that Gregersen's purse was within the confines of the apartment Webb shared with Gregersen, premises in which he had a legitimate expectation of privacy, is alone insufficient to establish his legitimate expectation of privacy in Gregersen's purse.[8] We

---

8. We recognize that the court in *Perez* summarily concluded that a defendant homeowner had a legitimate expectation of privacy in the luggage and handbags of his houseguests simply because he "should have been able to expect that any

personal property brought into the house by his overnight guests would be free from government intrusion." *Perez*, 700 F.2d at 1236. However, this conclusion appears to be dictum since *Perez* was contesting the admission of the con-

do not believe that a defendant's privacy interest in a common residence necessarily extends to a privacy interest in every object located inside that residence. *See United States v. Karo*, 468 U.S. 705, 725, 104 S.Ct. 3296, 3308, 82 L.Ed.2d 530 (1984) (O'Connor, J., concurring). Although it is possible that Webb could have shown a legitimate expectation of privacy in Gregersen's purse, he did not meet his burden of proof on this point.

Because Webb failed to show that his personal fourth amendment rights were infringed when the arresting officers invaded Gregersen's purse—conduct which we stress was not the product of any predicate illegality violating Webb's fourth amendment rights, *see Whisler*, 724 P.2d at 650–51 (Lohr, J., concurring); *see also* note 8, *supra*—he may not challenge the legality of the search of the purse in order to prevent admission of the diamond watch at trial.

## SUFFICIENCY OF EVIDENCE

■ Webb next challenges the sufficiency of the evidence to support his conviction. The standard of appellate review applicable to such a claim is well settled. We review the evidence and all inferences that may reasonably be drawn from it in the light most favorable to the jury's verdict, *State v. Verde*, 770 P.2d 116, 117 (Utah 1989), reversing a jury conviction only when the evidence, so viewed, is "sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *Id.* at 124 (quoting *State v. Booker*, 709 P.2d 342, 345 (Utah 1985)); *accord State v. Cobb*, 774 P.2d 1123, 1128 (Utah 1989); *State v. Belt*, 780 P.2d 1271 (Utah Ct.App.1989). "So long as there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably

be made, our inquiry stops." *Booker*, 709 P.2d at 345.

Under Utah Code Ann. § 76–6–302(1) (1978), a person commits aggravated robbery if, in the course of committing robbery, he or she

(a) Uses a firearm or a facsimile of a firearm, knife or a facsimile of a knife or a deadly weapon; [9] or

(b) Causes serious bodily injury upon another.

One may be convicted as an accomplice if, acting with the mental state required for the commission of the offense, he or she "solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense." Utah Code Ann. § 76–2–202 (1978).

Webb does not challenge the sufficiency of the evidence to support the jury's finding of all the elements of an armed robbery in which Humphrey was the principal actor. Indeed, Webb does not really contend that the physical and testimonial evidence was insufficient to support a finding of his participation as an accomplice in the crime. Instead, he argues that we should disregard all the evidence that supports his conviction as an accomplice in this armed robbery, while his conflicting testimony and the physical evidence supporting his alibi defense, a receipt issued by a gas station in Ely, Nevada, at which Gregersen's son worked, should be viewed as if it were the only credible evidence presented at trial. This is not, however, our role. It is the exclusive function of the jury to weigh the evidence and to determine the credibility of the witnesses. *Booker*, 709 P.2d at 345; *State v. Tolman*, 775 P.2d 422, 424 (Utah Ct.App.), *cert. denied*, 783 P.2d 53 (1989).

Russell Martindale testified that Webb had solicited him to steal the car eventually used as the getaway vehicle in the robbery, in which a sawed-off shotgun was used by the robber. Russell stole the car and

---

tents of his houseguests' effects as the product of a purportedly unconstitutional search of his own home. He was not independently contesting the seizure or search of those effects by police who were lawfully present on the premises.

**9.** This provision was recently amended. See text at note 10, *infra*.

turned it over to Webb in Salt Lake City the day before the robbery. Clothing items matching the description of those worn by the robber were found in that car. The night of the robbery, Webb told Russell that he knew someone in Las Vegas who could get rid of the "stuff" he and Humphrey had stolen. According to Britt Martindale's testimony, Webb appeared at her home shortly after the robbery on October 21, 1987, with the man later identified as the robber in the trunk of his car. Webb removed a canvas bag and a sawed-off shotgun from his trunk and took them into her house, where he emptied the bag and sorted through currency and jewelry later found at Webb's apartment and identified by the store owner as some of the items stolen from him. Webb told Britt that everything had gone great and that the police had not shown up for a little while. He stashed the canvas bag in her kitchen and told her not to disturb it. When he returned later to retrieve the bag, he told her he planned to dispose of it in the river.

Viewing this testimony and all the evidence in the light most favorable to the jury's verdict, *Verde*, 770 P.2d at 124, we conclude there was substantial evidence upon which the jury could reasonably find that Webb solicited, requested, commanded, encouraged, or intentionally aided Humphrey in the aggravated robbery of the jewelry store with the requisite intent. That evidence is not so inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that Webb committed the crime of aggravated robbery. Although there was conflicting evidence presented in support of the defense theory that Webb and Humphrey were innocent victims of a set-up by the Martindales, which, if believed, would have placed Webb in Ely, Nevada, the day before, and the day of, the robbery, the jury was not obligated to believe that evidence. *See State v. Smith*, 706 P.2d 1052, 1056 (Utah 1985).

### OTHER CLAIMS OF TRIAL ERROR

After careful consideration of ʻthe other claimed errors on appeal, which Webb asserts require the reversal of his conviction and remand for a new trial, we conclude that they are meritless and that discussion of them is unnecessary. *See Carter*, 776 P.2d at 888.

### SENTENCE

■ The trial judge sentenced Webb to serve an indeterminate prison term of five years to life for the armed robbery conviction, a first degree felony. *See* Utah Code Ann. § 76–6–302(2) (1978); *cf.* Utah Code Ann. § 76–6–301 (1978) (robbery is a second degree felony). He also added one mandatory year for use of a firearm and a discretionary five years for use of a firearm, each to run consecutively to the sentence of five years to life. The court enhanced the penalties pursuant to Utah Code Ann. § 76–3–203(1) (Supp.1989), which provides:

A person who has been convicted of a felony may be sentenced to imprisonment for an indeterminate term as follows:

(1) In the case of a felony of the first degree, for a term at not less than five years, unless otherwise specifically provided by law, and which may be for life but if the trier of fact finds a firearm or facsimile or the representation of a firearm was used in the commission or the furtherance of the felony, the court shall additionally sentence the person convicted for a term of one year to run consecutively and not concurrently; and the court may additionally sentence the person convicted for an indeterminate term not to exceed five years to run consecutively and not concurrently[.]

The mandatory enhancement provision was added to the statute by 1977 Utah Laws, ch. 88, § 1; the discretionary enhancement provision was added by 1976 Utah Laws, ch. 9, § 1. This statute has been upheld as a valid exercise of legislative authority that neither creates a separate offense nor imposes double punishment for the same criminal act. *State v. Angus*, 581 P.2d 992, 995 (Utah 1978). As the *Angus* court explained, the legislature has the authority to increase the degree of a crime where "instruments of violence" were used in its commission, and to increase the punish-

ment for the use of specific deadly weapons considered more dangerous than others. *Id.* at 994–95. More recently, in *State v. Speer*, 750 P.2d 186, 192 (Utah 1988), the Utah Supreme Court reaffirmed that the enhancement is merely part of the penalty based on the specific type of weapon used.

Before 1975, a person committed aggravated robbery pursuant to Utah Code Ann. § 76–6–302(1)(a) if he or she, in the course of committing a robbery, "use[d] a deadly weapon." Utah Laws 1973, ch. 196, § 76–6–302. The subsection was amended in 1975 to the form in effect at the time of Webb's conviction, i.e., a person committed aggravated robbery if he or she, in the course of committing robbery, "use[d] a firearm or a facsimile of a firearm, knife or a facsimile of a knife or a deadly weapon." Utah Code Ann. § 76–6–302(1)(a) (1978).

Webb contends that, under accepted principles of statutory construction, the firearm enhancement statute does not apply at all to his armed robbery conviction because his sentence was already "enhanced" to that for a first degree felony as a result of the use of a firearm in the commission of the robbery. He asserts that the legislature's 1975 amendment of the armed robbery statute to specify use of a firearm, coupled with the subsequent enactment of the general enhancement provisions, leads to an ambiguity about whether the legislature intended the latter to apply to aggravated robbery. Such an ambiguity, he claims, should be resolved in favor of lenity. *See State v. Egbert*, 748 P.2d 558, 562 n. 3 (Utah 1987). Furthermore, the more specific statute governing robbery with the use of a firearm should control over the more general enhancement statute.

Webb relies exclusively on *Simpson v. United States*, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978), in which the United States Supreme Court refused to permit the sentencing court to enhance the penalty for bank robbery using the general federal

firearm enhancement statute, 18 U.S.C. § 924(c), where the statute setting forth the elements of bank robbery, 18 U.S.C. § 2113(a), included an enhancement provision for a bank robbery committed "by the use of a dangerous weapon or device." 18 U.S.C. § 2113(d). We believe *Simpson* is distinguishable. First, the starting point for the court's construction of the federal statutes was its holding that section 924(c) created a separate offense from that in the underlying federal felony. *Simpson*, 435 U.S. at 10, 98 S.Ct. at 912. Thus, the *Simpson* court would have had to decide a double jeopardy issue if it had interpreted the general firearm enhancement statute as applicable to bank robberies committed using a firearm. In contrast, the Utah enhancement statute has been interpreted in *Angus* as not creating a separate offense from the underlying felony, thereby eliminating any double jeopardy concerns based on being tried twice for the same offense, which, in any event, Webb has not raised. Second, the statutory scheme in *Simpson* involved a specific enhancement provision for bank robbery committed with a dangerous weapon. Here, the use of a firearm is one element of the substantive crime of armed robbery as defined in the version of section 76–6–302(1)(a) in effect when Webb was convicted; that section is not an enhancement provision. Third, the *Simpson* court relied heavily on the legislative intent it found in the public comments of the sponsor of section 924(c), the general enhancement statute for firearm use in federal felonies, to the effect that it would not apply to section 2113 armed bank robberies. Here, the parties have referred to nothing indicating that the legislature intended the general sentence enhancement provisions of section 76–3–203(1) to *not* apply to aggravated robbery committed with a firearm. Indeed, we find legislative intent to the contrary in the recent amendment of the aggravated robbery statute [10] that eliminated specific reference to a fire-

---

10. Although this change was enacted by Utah Laws 1989, ch. 170, § 7 (effective April 24, 1989), after the robbery and conviction at issue in this case, we may consider the legislature's action in 1989 as persuasive evidence on the issue of whether, in the pre–1989 version of

section 76–6–302(1)(a), the legislature intended to single out aggravated robbery committed with a firearm for any kind of special sentencing treatment. *See State v. Bishop*, 753 P.2d 439, 486 (Utah 1988).

arm or knife and retained only the general term "dangerous weapon," Utah Code Ann. § 76–6–302(1)(a) (Supp.1989), as do the statutes setting forth the elements of other "aggravated" crimes, *e.g.*, Utah Code Ann. § 76–5–103 (Supp.1989) (aggravated assault); Utah Code Ann. § 76–6–203 (Supp. 1989) (aggravated burglary). We agree with the State that this change to conform the language of the aggravated robbery statute evinces the legislature's intent that the sentence enhancement provision apply uniformly to all aggravated crimes, including aggravated robbery.

Although it is unclear why the legislature amended section 76–6–302(1)(a) in 1975 to add the specific term "firearm" to the aggravated robbery statute, since robbery committed with a firearm was already covered by the general term "deadly weapon" retained in the subsection, we conclude that the amendment created no ambiguity over what penalty the legislature intended for robbery committed with a firearm. The legislature was merely increasing the degree of a robbery committed with the enumerated instruments of violence. In its subsequent adoption of the enhancement provision for firearm use in the commission of a first degree felony, the legislature exercised its authority to determine that, because firearms are more dangerous than knives or other deadly weapons, their use was more deserving of enhanced punishment. *See Angus*, 581 P.2d at 994–95.

Finally, Webb asserts that, even if the enhancement provisions of section 76–3–203(1) are applicable to his aggravated robbery conviction, the trial court erroneously imposed a total of six years as the term of enhancement. Based on the Utah Supreme Court's interpretation of the firearm enhancement statute as providing for a maximum enhancement term of five years, *State v. Willett*, 694 P.2d 601 (Utah 1984), the State concedes that the trial court erroneously imposed a six-year enhancement term.

We, therefore, direct the trial court upon remand to reduce the enhancement sentence for use of a firearm in the commission of the first degree felony of aggrava-

ted robbery from a total of six years to a total of five years. With this correction of the sentence, Webb's conviction is affirmed.

BENCH, J., and J. ROBERT BULLOCK, Senior District Judge, concur.