*1999 UT App 309*

**STATE of Utah, Plaintiff and Appellee,**

v.

**John Perry CHANEY, Defendant and Appellant.**

**No. 981063–CA.**

Court of Appeals of Utah.

Oct. 28, 1999.

Randall K. Spencer, Abbott, Spencer & Smith LLC, and Margaret P. Lindsay, Aldrich, Nelson, Weight & Esplin, Provo, for Appellant.

Jan Graham, Atty. Gen., Laura B. Dupaix, and Craig L. Barlow, Asst. Attys. Gen., Salt Lake City, for Appellee.

Before BENCH, BILLINGS, and DAVIS, JJ.

## OPINION

BILLINGS, Judge:

¶1 John Perry Chaney (Defendant) appeals his conviction of rape of a child as an accomplice, a first degree felony, in violation of Utah Code Ann. § 76–5–402.1 (1995). We affirm.

## FACTS

¶2 We recite the facts in a light most favorable to the jury's verdict. *See State v. Gordon,* 913 P.2d 350, 351 (Utah 1996).

¶3 Defendant and Defendant's daughter, A.C., first met Donald Beaver (Beaver) dur-

ing the summer of 1993 in an American Fork, Utah store. Beaver invited Defendant and his family, including A.C., to live with him in American Fork. A.C. was not quite thirteen-and-a-half years old when Defendant told her she was to marry the forty-eight-year-old Beaver in one week. When A.C.'s stepmother protested that A.C. was too young, Defendant responded that a girl was considered to be a woman at age twelve. Defendant said that God had told him that A.C. was to marry Beaver as punishment for her "rebellious" behavior.

¶ 4 Defendant promised Beaver that he would pray about whether Beaver and A.C. should marry. According to Defendant, God told him that marriage would be "a learning and growing experience for both [A.C. and Beaver]." Defendant then told Beaver that it was "not a matter of if . . . but a matter of when." Beaver wanted to get married that day, but Defendant demurred because he had never "taught [his] daughter about marriage." Defendant said he needed "a week at least to try and bring her up to speed about what marriage is all about."

¶ 5 In the ensuing week, Defendant instructed A.C. on her "wifely duties," including darning socks, cleaning house, and not "chastising" or "nagging" Beaver. Although Defendant doubted A.C.'s emotional readiness, he also instructed her regarding her duties in the "marriage bed." Defendant told A.C. that "she couldn't be a little girl anymore." Defendant "figured that [A.C.] would grow to maturity under Beaver's tutelage." Defendant never suggested to A.C. during his instructions that she and Beaver should wait to engage in sexual relations.

¶ 6 A week later, on September 28, 1993, Defendant gave A.C. to Beaver in a ceremony in which Defendant had the couple sign a "Patriarchal Marriage Covenant/Contract" that he had prepared. After the ceremony, Beaver and A.C. slept alone in the same room. The following day, Defendant and the rest of his family left A.C. alone with Beaver in American Fork.

¶ 7 About a month after the ceremony, Beaver had intercourse with thirteen-year-old A.C. for the first time in his American Fork home. A.C. submitted because she be-

lieved that the ceremony performed by Defendant had made her Beaver's wife. A.C. also believed that Defendant had performed the ceremony because "he was the only one allowed to give [her] to another man." A.C. would not have had intercourse with Beaver if Defendant had not performed the ceremony. Over the next few months, Beaver repeatedly had sexual intercourse with A.C. while A.C. was still only thirteen years old.

¶ 8 In February of 1994, A.C. separated from Beaver because instead of ejaculating inside her during intercourse, Beaver would pull out and ejaculate on the bed. A.C. felt this was wrong because of what Defendant had told her during her week of marital "instruction." A.C. was also upset because Beaver would introduce her to others as a friend's daughter whom he was babysitting rather than as his wife.

¶ 9 A.C. turned fourteen in April 1994, over two months after she separated from Beaver. Later that summer, A.C. talked to law enforcement officials about the ceremony performed by Defendant and Beaver's sexual relationship with her. In August 1994, A.C. called Defendant (then living in Idaho), and told him that she had talked to an investigator. The following day, A.C. went to visit Defendant in Idaho.

¶ 10 Defendant told A.C. that she needed to reconcile with Beaver and that it was inappropriate for her not to be with him. For the first time, Defendant told A.C. that Beaver had agreed not to have intercourse with her until she was sixteen. Defendant never suggested that Beaver's failure to wait until A.C. was sixteen was grounds for annulment. Indeed, Defendant viewed Beaver's and A.C.'s intercourse as a validation or legalization of their marriage.

¶ 11 A few days later, A.C. asked Beaver on the phone why he had not told her that Defendant had wanted them to wait to have intercourse until she was sixteen. Beaver denied that Defendant had ever said anything about waiting. A.C. also told Defendant that she "didn't have much fun" when she and Beaver were "together sexually." Thinking that A.C. "obviously need[ed] to have a greater understanding than she pos-

sessed about her own bodily needs and how to satisfy them," Defendant decided to instruct A.C. "more thoroughly in everything associated with marriage." Defendant gave A.C. copies of *The Kama sutra* and *The Sensuous Woman.* He also bought her a vibrator and told her "to practice and try to learn how to enjoy the feeling more—the feelings of [sexual] stimulation."

¶ 12 Beaver traveled to Idaho to reconcile with A.C. Beaver expressed his wish to take A.C. to Mexico to legally validate their marriage because he was worried that he might be charged with statutory rape. Defendant objected, stating that A.C. was Beaver's wife under God's laws and there was no need to legalize the marriage under statute. Defendant believed that marrying with a license and under statute would permit the government to wrongfully regulate the couple's children. A.C. left with Beaver, but soon returned alone to Defendant in Idaho. Defendant prepared a document purporting to annul the marriage contract.

¶ 13 After this, Defendant, A.C., and others met with Wayne and Angela Brasda at Lakeview Lodge, Louisiana. Wayne Brasda was Defendant's friend and a missionary for Defendant's religious beliefs. As punishment for stealing food, Defendant gave A.C. to be Brasda's concubine. Defendant told A.C. that as a concubine she could not speak to Brasda unless spoken to and then she must call Brasda "my lord." Defendant told A.C. that she was "to do everything that [Brasda] told [her] to do, and that no matter what he said [she] was supposed to do it." Defendant instructed both Brasda and A.C. that they had "to have intercourse for [A.C.] to fully become [Brasda's] concubine." After learning that she was to become Brasda's concubine, A.C. wrote her father a letter stating that she had received a "spiritual" confirmation that this was her punishment. Brasda had intercourse with A.C. one time while Brasda's wife watched.

¶ 14 Soon after this, A.C. ran away from her father in Louisiana. A Louisiana pediatrician who examined A.C. concluded that she had been sexually active in the past. A.C. eventually went to live with her maternal grandparents in Oklahoma.

¶ 15 A hearing to extradite Defendant to Utah was held in Michigan on January 11, 1996. At that hearing, Defendant, speaking for himself, attempted to defend giving A.C. to Beaver. He stated that at the time of the "marriage contract," A.C. had "attained to lawful marrying age before almighty God." Defendant called A.C. his "chattels and goods" and explained that, at the time of the marriage contract, A.C. was "solely under [his] authority." As her "patriarch," Defendant gave A.C. his consent to enter into the marriage contract.

¶ 16 Defendant also asserted that sex among thirteen-year-olds was rampant in Utah and elsewhere, and Defendant boasted that he had merely "provided a means whereby [his] daughter wouldn't join the ranks of those who wanted sex but are denied the opportunity and [sic] make any lasting commitments." Defendant then stated that Brasda, who was present at the marriage contract ceremony, could confirm "how eager the two of them [A.C. and Beaver] were to get at each other."

¶ 17 Defendant claimed that he had extracted a promise from both Beaver and A.C. before the marriage that they would not have intercourse before A.C. turned sixteen. Defendant's mother testified that in October 1993, Defendant told her about the marriage and about this agreement. A.C.'s mother also testified that both A.C. and Beaver mentioned to her that they had promised Defendant that they would not have intercourse until A.C. was sixteen.

¶ 18 After trial, the jury convicted Defendant on three counts of rape of a child as an accomplice. This appeal followed.

## ANALYSIS

¶ 19 Defendant raises multiple claims of error on appeal. We address each separately.

### I. Section 76–5–407(1)

¶ 20 Defendant was convicted of rape of a child as an accomplice or party to the crime. Defendant argues that Beaver did not rape A.C.—and therefore Defendant cannot be an

accomplice thereto—because A.C. and Beaver were married at the time they had sexual intercourse. *See* Utah Code Ann. § 76–5–407(1) (1995) (mandating that the sexual offenses listed in Title 76, part 4, do not apply to "consensual conduct between persons married to each other"). The State contends that A.C. and Beaver's marriage was void ab initio and that their marriage was therefore a legal nullity.

¶ 21 Utah's marriage statute provides in relevant part:

> The following marriages are *prohibited and declared void:*
>
> (1) when there is a husband or wife living, from whom the person marrying has not been divorced;
>
> (2) when the male or female is under 18 years of age unless consent is obtained as provided in Section 30–1–9;
>
> (3) *when the male or female is under 14 years of age;*
>
> (4) between a divorced person and any person other than the one from whom the divorce was secured until the divorce decree becomes absolute, and, if an appeal is taken, until after the affirmance of the decree;
>
> (5) between persons of the same sex.

Utah Code Ann. § 30–1–2 (1998) (emphasis added).

¶ 22 "We first examine the statute's plain language." *Matrix Funding Corp. v. Auditing Div. of the Utah State Tax Comm'n,* 868 P.2d 832, 833 (Utah Ct.App.1994). "When construing a statute, we must give effect to legislative intent. To that end, we presume that the Legislature used each term advisedly, and we give effect to each term according to its ordinary and accepted meaning." *Versluis v. Guaranty Nat'l Cos.,* 842 P.2d 865, 867 (Utah 1992) (citations omitted).

¶ 23 Under the plain language of section 30–1–2, A.C.'s purported marriage to Beaver was "void," and not merely "voidable," as Defendant asserts. We assume "the Legislature used [the] term ["void"] advisedly," *Versluis,* 842 P.2d at 867, and declined to use the more liberal term "voidable" in this context. Moreover, we note that this conclusion is supported by the ordinary meaning of the term "void." *See id.* "Void" is commonly understood to mean "null, ineffectual," and in the case of marriages, "invalid from its inception." *Black's Law Dictionary* 1573–74 (6th ed.1990).

¶ 24 Furthermore, this reading is consistent with our prior caselaw and with the decisions of other jurisdictions. Several Utah cases have evaluated the types of marriages deemed "void" under section 30–1–2 and have concluded that those marriages are, in fact, void ab initio.

¶ 25 Early this century, the Utah Supreme Court implicitly recognized that a marriage license issued to a minor younger than the statutory age for marriage was void ab initio. *See State v. Stewart,* 57 Utah 224, 193 P. 855, 856 (1920). In *Stewart,* a man was convicted of adultery with another man's wife. He appealed, claiming that, at the time of her marriage, the woman with whom he committed adultery was only sixteen, and the marriage was therefore illegal. *See id.* The Supreme Court disagreed and held that

> [w]hen marriage licenses are issued to parties under age without the written consent of father, mother, or guardian, the marriage is not void *unless the male is under 16 or the female under 14 years of age,* and a marriage is not invalidated by the fact that the male had not reached the age of 21 or the female the age of 18.

*Id.* (citation omitted) (emphasis added). By implication, *Stewart* holds that such a marriage would be void ab initio if the male was under sixteen or the female under fourteen years of age.

¶ 26 More recently, we held that a marriage solemnized before the divorce of one party was finalized was void ab initio. *See Van Der Stappen v. Van Der Stappen,* 815 P.2d 1335, 1338 (Utah Ct.App.1991). In *Van Der Stappen,* the parties married in 1984, but the wife's "previous marriage to another man had not yet been legally dissolved." *Id.* at 1336. Nevertheless, "the parties conducted themselves as husband and wife for the next several years" until the husband, in 1988, filed for divorce. *Id.* On appeal, husband contested the trial court's denial of his motion to set aside the decree of divorce, main-

taining that because his marriage to his second wife was void ab initio, the trial court lacked subject matter jurisdiction to enter a divorce decree. *See id.* at 1337. We agreed and held that "[b]ecause [the wife's] prior divorce was not final and absolute until some time after her wedding to [her second husband], under section 30-1-2, the marriage of the parties was *void at its outset, and no court action was required to establish this."* *Id.* at 1338 (emphasis added).

¶ 27 Moreover, other courts that have considered the issue have concluded that such marriages are *void from the outset.* For example, the Michigan Court of Appeals concluded that a marriage to a female under the age of consent is void ab initio under Michigan statute. *See Tigner v. Tigner,* 90 Mich. App. 787, 282 N.W.2d 481, 482 (1979). In *Tigner,* the applicable Michigan statute provided: "No marriage, common law or ceremonial, in this state shall be contracted where the female is under the full age of sixteen [16] years, and any such marriage, if entered into, shall be void." *Id.* (citation omitted). The court concluded that the Michigan statute "renders the ceremonial marriage between the parties *absolutely void"* where one of the parties was under sixteen. *Id.* (emphasis added); *see also Walter v. Walter,* 433 S.W.2d 183, 191 n. 1 (Tex. Civ.App.1968) (stating marriage to a person under the statutory age for marriage should be held void ab initio).[1]

¶ 28 We conclude the statutory language of section 30-1-2 reveals a legislative intent that marriages to children under the age of fourteen are void at the outset. Therefore, we conclude that, as a matter of law, A.C. and Beaver's marriage was a legal nullity. Accordingly, Beaver committed the crime of rape of a child, and Defendant could be held liable as an accomplice to that act.

## II. Sufficiency of the Evidence

¶ 29 Defendant next asserts the evidence was insufficient to convict him as a party to

the crime of rape of a child. Specifically, he asserts there was insufficient evidence to show Defendant knew that Beaver intended to have sexual intercourse with A.C. when she was under the age of fourteen.

¶ 30 In reviewing an insufficiency of the evidence claim, we view "'the evidence and all inferences which may be reasonably drawn from it in the light most favorable to the verdict of the jury.'" *State v. Brown,* 948 P.2d 337, 343 (Utah 1997) (citation omitted). We may not weigh evidence or assess witness credibility, but instead "assume that the jury believed the evidence and inferences that support the verdict." *State v. Wood,* 868 P.2d 70, 87 (Utah 1993). Evidence is insufficient only when, so viewed, it "'is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the [charged] crime.'" *State v. Johnson,* 821 P.2d 1150, 1156 (Utah 1991) (citations omitted).

¶ 31 We conclude the jury was presented with sufficient evidence to find that Defendant knew and intended that his conduct would result in Beaver having intercourse with A.C. while she was only thirteen. A.C. testified that, during the week preceding the ceremony, Defendant instructed her regarding her "wifely duties," including what would be expected of her in the "marital bed." These instructions included telling A.C. that she could not always refuse to have sex with Beaver, that she should "go as nature leads," and that "she couldn't be a little girl anymore." A.C. also testified that, before the ceremony, Defendant did not tell her that she should wait until she was sixteen before having intercourse. Not until after A.C. had separated from Beaver and talked to authorities did Defendant tell A.C. that Beaver had agreed to wait until she was sixteen to have intercourse with her. Beaver denied to A.C. that he had ever made such an agreement.

---

1. Defendant makes several arguments regarding the relationship of section 30-1-2 to Title 30, which contains a variety of sub-chapters dealing with the formation, validation, and termination of marriage in Utah, claiming that "void" means "voidable." We are not persuaded by Defendant's arguments, as we read the statutory language and the relationship among the sections differently than Defendant.

¶ 32 Additionally, Defendant performed the ceremony while A.C. was thirteen, instead of waiting until she was sixteen. The words of the ceremony, which Defendant drafted and A.C. and Beaver spoke, made reference to the couple having children. Defendant testified that immediately after the ceremony, A.C. and Beaver were "eager to get at each other" and that they were "grabbing each other."

¶ 33 Moreover, Defendant stated at the Michigan extradition hearing that his purpose in giving A.C. to Beaver was to provide "a means whereby [A.C.] wouldn't join the ranks of those who wanted sex, but were denied the opportunity to make lasting commitments." When A.C. told Defendant that Beaver had had sex with her, Defendant was not upset that they had not waited, but was only upset that Beaver would "spill his seed" outside of her. Further, after learning that A.C. and Beaver had engaged in sex, Defendant still encouraged A.C. to reconcile with Beaver and gave her a vibrator and copies of *The Kama sutra* and *The Sensuous Woman* to enhance A.C.'s sexual relationship with Beaver.

¶ 34 Taken together, we conclude the evidence was sufficient for the jury to find that Defendant intended and expected Beaver and A.C. to have sex.

### III. "Presence" as a Precondition to Accomplice Liability

¶ 35 Defendant argues that he cannot be held liable as an accomplice because he was neither physically nor constructively present when Beaver raped A.C.

¶ 36 Again, we turn first to the plain language of the statute. *See Matrix Funding Corp.*, 868 P.2d at 833. In Utah, a person is criminally liable as a party to an offense when, acting with the requisite mental state, he "solicits, requests, commands, encourages, or intentionally aids another person" to commit the offense. Utah Code Ann. § 76–2–202 (1995). No mention is made of actual or constructive presence during the commission of the offense as a precondition to liability. Under the plain language of the statute, presence is not required for accomplice liability to attach.

¶ 37 Moreover, we have previously concluded that an accomplice's "presence" at the location of a sexual assault is not a necessary precondition for liability to attach. *See State v. Beltran–Felix*, 922 P.2d 30, 36 (Utah Ct. App.1996). In *Beltran–Felix*, the defendant was convicted, in part under section 76–2–202, of aggravated sexual assault. *See id.* The defendant appealed, arguing that because he was not present when his partner raped the victim, he could not be held liable under the statute. *See id.* We disagreed and held:

> [W]e believe the jury could properly have inferred that defendant intentionally aided [his partner] in the sexual assault.... [T]he jury could infer that defendant's presence in the front of the jewelry store was to prevent interference with [his partner's] sexual assault on [the victim].... Accordingly, the trial court did not err in refusing to dismiss the charge of aggravated sexual assault.

*Id.; see also State v. Peterson*, 881 P.2d 965, 971 n. 7 (Utah Ct.App.1994) (holding that person who helps plan crime but does not actively participate in commission of crime can be charged as accomplice under section 76–2–202); *State v. Cayer*, 814 P.2d 604, 612 (Utah Ct.App.1991) (holding that defendant need not be physically present to intentionally aid partner in beating death of victim).

¶ 38 Here, viewing the evidence in a light most favorable to the jury verdict, the jury could have inferred that, while not present at the location of the rape, Defendant intentionally aided Beaver in the rape of A.C. He gave A.C. to Beaver with the understanding that they would live together as husband and wife, sleep in the same bed, and have children. Defendant instructed A.C. on her sexual obligations in the relationship, telling her that she must submit to Beaver and not always refuse to engage in sexual relations with him. The jury could have properly inferred that this conduct made it possible for Beaver to commit the crime of rape of a child.

¶ 39 Accordingly, we conclude Defendant could be held liable as a party to the rape of

A.C. under section 76–2–202 even though he was not present during the commission of the crime.

## IV. Illegal Solemnization of Marriage

■ ¶ 40 Defendant argues that he was improperly charged with rape of a child because his conduct is more specifically covered by the Utah statute criminalizing solemnization of illegal marriages. *See* Utah Code Ann. §§ 30–1–13 to –15 (1998). Relying largely on *State v. Hill*, 688 P.2d 450 (Utah 1984), Defendant argues that his underlying conduct consisted solely of solemnizing an illegal marriage that happened to result in Beaver's having sexual relations with A.C. while she was only thirteen. Defendant argues that because the solemnization statute specifically proscribes his performance of an illegal marriage, *Hill* prohibits his conviction as a party to the rape of a child. We disagree.

¶ 41 The defendant in *Hill* received $2,100 in cash from an undercover agent for one ounce of baking soda, which the defendant claimed was "good" cocaine. *See id.* at 451. Defendant, convicted of second degree felony theft by deception, appealed on the ground that his conduct was more specifically covered by a statute prohibiting distribution of an imitation of a controlled substance. *See id.* The *Hill* court agreed, largely on the ground that the Controlled Substances Act contained a specific section making its provisions controlling over any other conflicting statutory provision, and held that "when an individual's conduct can be construed to be in violation of two overlapping statutes, the more specific statute governs." *Id.*

¶ 42 Defendant's reliance on *Hill* is misplaced. There, the defendant's conduct was fully covered by both a general and a specific statute. Here, the crimes do not overlap. Defendant performed an illegal marriage, but that was not the sum total of his misconduct. Defendant also turned A.C. over to Beaver with the understanding that the two would engage in sexual intercourse, encouraging her to act "as a wife."

¶ 43 Given that Defendant's conduct—giving A.C. to Beaver—falls squarely under the crime of rape of a child as a party, he was not entitled to be charged merely with performing an illegal marriage. Instead, Defendant might have been charged under both statutes. *See State v. Tennyson*, 850 P.2d 461, 470 (Utah Ct.App.1993) (stating that defendant may be charged with lesser but not included crimes in addition to greater charged crime).

## V. Jury Instructions on Accomplice Liability

■ ¶ 44 Defendant argues that accomplice liability can attach only where the accomplice acts with specific intent and that the trial court improperly instructed the jury regarding this mens rea requirement. Utah's accomplice liability statute provides: "Every person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct." Utah Code Ann. § 76–2–202 (1995). According to Defendant, the terms "solicits," "requests," "commands," and "encourages" are ambiguous as to their mens rea requirement, and we should therefore apply the doctrines of *noscitur a sociis* and *ejusdem generis* to insert "intentionally" before each term. We disagree.

¶ 45 Once again, we consider the plain language of the statute. *See Matrix Funding Corp.*, 868 P.2d at 833. "We assume that each term in the statute was used advisedly; thus the statutory words are read literally, unless such a reading is unreasonably confused or inoperable. Only if we find some ambiguity need we look further." *Stephens v. Bonneville Travel, Inc.*, 935 P.2d 518, 520 (Utah 1997) (citations and internal quotations omitted).

■ ¶ 46 The plain language of the accomplice statute contradicts Defendant's theory. Had the Legislature intended to modify the entire phrase with "intentionally," it would have placed that modifier at the beginning of the phrase rather than just before the last verb. Instead, "solicits, requests, commands, [and] encourages" follow the mo-

difier "acting with the mental state required for the commission of an offense." Utah Code Ann. § 76-2-202 (1995). We conclude that the placement of the word "intentionally" directly before the word "aids" evinces a clear legislative intent that "intentionally" modify only that word. This reading of the statute is neither unreasonably confused nor inoperable, therefore we do not resort to further methods of statutory construction.[2]

¶ 47 Defendant further argues that it is incomprehensible that solicitation and conspiracy could require a higher mens rea[3] and yet be lesser crimes than accomplice to rape of a child.[4] Defendant's reference to the specific intent required for solicitation and conspiracy is unavailing: although these inchoate crimes require specific intent, the legislature could have good reason to require a lesser mental state where a crime is consummated. In any event, it is not within the province of this court to judge the wisdom of legislation. *See Stephens*, 935 P.2d at 522.

¶ 48 Finally, Defendant cites older Utah case law for the proposition that accomplice liability must be premised on specific intent. Those cases, however, predate the 1973 enactment of section 76-2-202. *See, e.g., State v. McDonald*, 26 Utah 2d 336, 489 P.2d 434, 435 n. 1 (1971) ("It is interesting to note that statutorily our state has not defined an 'accomplice,' the matter having been left to the decisions of the courts, text writers, etc. ..." (citing *State v. Wade*, 66 Utah 267, 241 P. 838 (1925); *State v. Coroles*, 74 Utah 94, 277 P. 203 (1929))). That case law, to the extent that it is inconsistent with section 76-2-202, has been legislatively overruled. *See, e.g., DeBry v. Noble*, 889 P.2d 428, 434 (Utah 1995) (noting that statutory amendments altered common law definition of "governmental function").

¶ 49 Our reading of section 76-2-202 comports with that section's well-established meaning. For example, in *State v. Webb*, 790 P.2d 65 (Utah Ct.App.1990), we explicitly stated that conviction under section 76-2-202 requires that the defendant solicit, request, command, encourage, or intentionally aid "with the mental state required for the commission of the offense." *Id.* at 84. Likewise, in *State v. Smith*, 706 P.2d 1052 (Utah 1985), our Supreme Court noted that accomplice liability for aggravated robbery and second degree felony theft require different metal

---

2. Defendant's resort to *ejusdem generis* and *noscitur a sociis* is inappropriate. Those doctrines apply where an ambiguous, general term has no meaning outside the context in which it is used. *See, e.g., State v. Vogt*, 824 P.2d 455, 457-58 (Utah Ct.App.1991). Under those circumstances, the meaning of the general term is derived from the enumerated, unambiguous, specific terms that it follows. *See id.* at 458. As our Supreme Court explained, "when a group of related things are specifically enumerated, the mind is focused upon that class of things, and ... the addition of general terms is purposed to avoid inadvertent omission and to include like things of the same class." *Heathman v. Giles*, 13 Utah 2d 368, 374 P.2d 839, 840 (1962) (holding "sheriff, constable, peace officer, state road officer, or any other person charged with the duty of [law enforcement]" does not include prosecuting attorneys). Thus, where a code section criminalizes performing sexual intercourse or sodomy, exposing one's genitals, masturbating, trespassory voyeurism, and "any other act of lewdness" in front of a child, we held that the "other acts of lewdness" prohibited were those "of equal gravity as those acts proscribed in the statute." *Vogt*, 824 P.2d at 458 (interpreting Utah Code Ann. § 76-9-702.5 (1990)). Applying *ejusdem generis* thus supplies meaning to words that lack meaning independent of their context.

In contrast, the terms solicits, requests, commands, and encourages carry meaning independent of their context in section 76-2-202. They are not general terms added for the purpose of avoiding inadvertent omission but rather are specific terms selected for their particular meaning. *Ejusdem generis* and *noscitur a sociis* therefore have no application in the interpretation of section 76-2-202.

3. Conspiracy and solicitation are specific intent crimes. *See* Utah Code Ann. § 76-4-201 (1995) (providing in relevant part: "a person is guilty of conspiracy when he, intending that conduct constituting a crime be performed"); *id.* § 76-4-203 (providing in relevant part: "An actor commits criminal solicitation if with intent that a felony be committed ...").

4. Whereas rape of a child is a first degree felony with a minimum sentence of five years, *see* Utah Code Ann. § 76-5-402.1(2) (1995), conspiracy to rape of a child is a first degree felony with a minimum sentence of three years, *see id.* § 76-4-202(2) (Supp.1999), and solicitation of rape of a child is a second degree felony. *See id.* § 76-4-204(2) (1995).

states: the former requires that the defendant solicit, request, command, encourage, or intentionally aid another "knowingly and intentionally"; the latter requires that the defendant do so "intentionally, knowingly, or recklessly." *Id.* at 1056. These examples demonstrate that the meaning of section 76-2-202 is not seriously disputed and that intent is not the mens rea required for accomplice liability to attach.

▆▆▆ ¶ 50 In summary, we conclude that criminal liability attaches to one who solicits, requests, commands, encourages, or intentionally aids another and does so with the mental state required for commission of the offense. Thus, the jury could have found Defendant guilty of child rape if he: (1) with the mental state required for the commission of rape of a child, (2) solicited, requested, commanded, encouraged, or intentionally aided Beaver to rape a child. We must now resolve the mental state required for rape of a child.

¶ 51 Rape of a child has two elements: (1) sexual intercourse (2) with a child who is under the age of fourteen. *See* Utah Code Ann. § 76-5-402.1(1) (1995). We have previously held that the age element of child rape imposes strict liability. *See State ex rel. W.C.P. v. State,* 974 P.2d 302, 304 (Utah Ct.App.1999). Because section 76-5-402.1(1) specifies no mens rea for the sexual intercourse element, the mens rea is provided by Utah Code section 76-2-102:

when the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability, in-

tent, knowledge, or recklessness shall suffice to establish criminal responsibility.

Utah Code Ann. § 76-2-102 (1995). Thus, under section 76-2-102, Defendant would be guilty of rape of a child if he intentionally, knowingly, or recklessly solicited, requested, commanded, encouraged, or intentionally aided Beaver to have sexual intercourse with A.C.

▆▆▆ ¶ 52 We now consider whether the trial court correctly instructed the jury on the required mental state and the State's burden of proving that mental state.

¶ 53 The trial court gave an elements instruction to the jury that closely tracked the language of the accomplice statute but omitted the language referring to the required mental state.[5] The instruction given thus does not specify the culpable mental state required for soliciting, requesting, commanding, or encouraging.

▆▆▆ ¶ 54 To avoid manifest injustice, an elements instruction that fails to include the mens rea constitutes reversible error. *See State v. Stringham,* 957 P.2d 602, 608-09 (Utah Ct.App.1998). However, "a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error." *State v. Anderson,* 929 P.2d 1107, 1109 (Utah 1996); *see also State v. Kiriluk,* 975 P.2d 469, 475 (Utah Ct.App.1999) ("[T]he manifest injustice exception has no application in cases in which the defendant invited the very error complained of on appeal"); *State v. Perdue,* 813 P.2d 1201, 1206 (Utah Ct.App.1991) ("[W]here invited error butts up against

---

5. Instruction number 7 instructed the jury:
  In order to convict the defendant, John Perry Chaney, of the crime of Rape of a Child, a first degree felony, as charged in Count 2 of the Second Amended Information, you must find from the evidence, beyond a reasonable doubt, all of the following elements of that crime:
  1) Between September 15, 1993, and February 1994,
  2) In Utah County, Utah,
  3) John Perry Chaney,
  4) Solicited, requested, commanded, encouraged, or intentionally aided another person: Don Beaver.
  5) To have sexual intercourse with [A.C.],
  6) Who was a minor child under the age of 14,

7) That Don Beaver had sexual intercourse with [A.C.], a child under the age of 14, after October 28, 1993, and before mid-February 1994 in Salt Lake County, Utah (12473 West 700 South).
  If the State has proven each and every one of the foregoing elements beyond a reasonable doubt, then it is your duty to find John Perry Chaney guilty of Rape of a Child, a first degree felony, as charged in Count 2 of the Second Amended Information. If the State has failed to prove any one or more of the previously-described elements, you must find John Perry Chaney not guilty of Rape of a Child, a first degree felony, as charged in Count 2 of the Second Amended Information.

manifest injustice, the invited error rule prevails.").

¶ 55 The record reflects, and Defendant admits, that the trial court proposed a jury instruction that included the appropriate mens rea—intentionally, knowingly, or recklessly—in front of solicits, requests, commands, and encourages. Defendant objected to this jury instruction, pressing his theory that the accomplice statute requires intent. Because Defendant rejected the trial court's correct proposed instruction, Defendant invited the error complained of and cannot take advantage of the trial court's error in the instruction given.

## VI. Rule 806

¶ 56 Finally, Defendant alleges the trial court erred by not admitting a document purporting to be an affidavit by Beaver. At the time of trial, Beaver had been charged with rape of a child, but was a fugitive. Over Defendant's objection, A.C. testified that Beaver told her that Defendant had never talked to him about waiting to have sex until she was sixteen. Thereafter, Defendant sought to introduce into evidence under Rule 806 [6] several lines from an undated, unpaginated, typewritten document entitled "Affidavit" and purportedly signed by Beaver. The document consisted of two pages stapled together. The document stated that Beaver and A.C. had never had sex and that Defendant had asked Beaver "to be sure to wait to have such contact with [A.C.] until she was at least sixteen years of age." At the end of the document, under the purported signature

of Don Beaver, was a notary seal followed by the notary's undated signature. The document contained no certificate of acknowledgment.

¶ 57 The trial court denied the admission of the affidavit primarily on the ground that the document had "serious foundational problems." Specifically, the court pointed to the fact that the document was undated, unpaginated, lacked a typical attestation at the end, did not say whether Beaver was making the statement from personal knowledge, and did not state that he had even read the document. The trial court found that Defendant had not presented sufficient evidence to authenticate the document under Rule 901(a) of the Utah Rules of Evidence and that the document was not self-authenticating under Rule 902 of the Utah Rules of Evidence. The court also found that the document lacked sufficient indicia of reliability.

¶ 58 Regardless of the applicability of Rule 806, the affidavit had to meet basic foundational and reliability requirements. Authentication or identification of evidence is "a condition precedent to admissibility." Utah R. Evid. 901(a). Here, the trial court specifically found that Defendant had not met the condition precedent and that the document itself was inherently unreliable. Defendant has neither challenged those findings on appeal nor shown that they were clearly erroneous. Consequently, we conclude the trial court properly excluded the document without regard to its admissibility under Rule 806.[7]

6. Rule 806 of the Utah Rules of Evidence provides:

When a hearsay statement ... has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain.
Utah R. Evid. 806.

7. Even if we were to conclude that the trial court erred in refusing to admit the evidence, Defendant has failed to show why this error was not harmless. *See State v. Jacques*, 924 P.2d 898,

902 (Utah Ct.App.1996) ("We must still decide whether the trial court's error ... was harmless."). We note that Defendant only wanted to use a portion of the affidavit to rebut A.C.'s testimony that Beaver had said there was no agreement between himself and Defendant that they would not have sex until she was 16. This statement was merely cumulative.

First, Defendant testified that there was such an agreement. Second, Defendant's mother corroborated that testimony by stating that she recalled Defendant telling her about that agreement soon after the ceremony. Finally, A.C.'s mother testified that she recalled both A.C. and Beaver telling her about the agreement while the two were living together. Given that Defendant was able to adduce the same evidence through other means, we would hold that any error in not admitting the document was harmless.

## CONCLUSION

¶ 59 A.C.'s marriage to Beaver was a legal nullity. Beaver thus committed rape of a child when he had sex with then thirteen-year-old A.C., and Defendant was subject to prosecution as an accomplice to that crime. Defendant's liability depended upon neither his actual nor his constructive presence at the time the rapes occurred, and the evidence was sufficient for the jury to convict. Because the elements of solemnization of an illegal marriage differ from the elements of rape of a child, Defendant was not entitled to be charged with the former in lieu of the latter. We reject Defendant's argument that accomplice liability requires specific intent, and any infirmities in the trial court's instructions to the jury were invited by Defendant. Finally, the trial court did not err by refusing to admit the purported Beaver affidavit.

¶ 60 We therefore affirm Defendant's conviction.

¶ 61 I CONCUR: JAMES Z. DAVIS, Judge.

¶ 62 I CONCUR IN THE RESULT: RUSSELL W. BENCH, Judge.

